[Sac. No. 5947.   In Bank.   July 31, 1950.]

JOHN W. BOMBERGER et al., Plaintiffs and Respondents, v. D. P. McKELVEY et al., Appellants; FRED L. HILL et al., Cross-defendants and Respondents.

Taylor & Taylor, Edward T. Taylor and Edward T. Taylor, Jr., for Appellants.

Vernon F. Gant for Respondents.

GIBSON, C. J.—Plaintiffs brought this action against D. P. McKelvey to recover a sum of money promised for the demolition and removal of a building which stood on real property purchased by McKelvey from plaintiffs. Further, plaintiffs, as assignees of Mr. and Mrs. Fred L. Hill, sought to recover a sum of money which McKelvey promised to pay to the Hills in return for the latters' surrender of a lease of the premises.

A counterclaim and cross-complaint was filed against plaintiffs and the Hills seeking damages for trespass and waste. R. G. McKelvey, who had become a coowner of the property, joined in this pleading, and as a result thereof the trial court ordered that he be made a party defendant with D. P. McKelvey and that the Hills be made parties cross-defendant. Defendants have appealed from a judgment granting the relief requested in the complaint.

Early in 1946 defendants purchased 12 lots in the city of Modesto for the purpose of constructing a building and adjoining parking facilities for rental to a chain grocery store. Four of these lots, including Lots 15 and 16, were acquired from plaintiffs for $60,000. At this time Lots 15 and 16 were improved by a business structure occupied by the Hills under a lease, which plaintiffs assigned to defendants on March 16, 1946.

During negotiations for the sale of the lots the Hills agreed to surrender their lease upon payment of $4,000 by defendants, less $300 per month rent after March 1, 1946, and to vacate the premises "immediately upon the completion" of a new building to be built for the Hills by plaintiffs elsewhere in Modesto. A written agreement or "Deposit Receipt" entered into by plaintiffs and defendants on February 28, 1946, provided that the sale of the real property to defendants should be subject to the temporary occupancy of the old building on Lots 15 and 16 by the Hills at a rental of $300 per month and that "The seller warrants such occupancy shall terminate and the improvements shall be removed not later than 20 days prior to the completion" of the contemplated chain store building. The instrument provided for payment of $70 for each day the old building remained standing after the agreed date unless the delay was caused by certain specified events, such as strikes, which prevented completion of the new building for the Hills. The deposit receipt also provided that plaintiffs "retained" certain dwellings on the remainder of the property and agreed to remove them within 60 days, but no such reservation of title was made with respect to the building on Lots 15 and 16.

It was orally agreed that defendants would pay plaintiffs $3,500 upon the demolition and removal of the old building on Lots 15 and 16. During the various conversations relating to the transaction defendants stated that they did not want the old building or any part of it, and it appears that Lots 15 and 16 were to be used as a parking lot by the chain store

Plaintiffs informed defendants that they intended to use whatever material they could from the old building in constructing the new one for the Hills.

The oral agreement was confirmed by a letter from defendants to plaintiffs on March 11, 1946, wherein defendants recited that plaintiffs were to "remove the existing improvements therefrom" and that in consideration for this defendants would pay them $3,500. The letter further stated that if plaintiffs were prevented by strikes, government regulations, or the like, from completing the new building, the Hills could continue to occupy the old building and the time for its "removal" should be "extended to coincide with the completion of said new building." In reliance upon this letter and the agreement to tear down the old building, plaintiffs changed the plans for the new building "to fit the possible use of salvage" from the old building, namely, plate glass and skylights, and for this reason did not order those items, which were then scarce and could be obtained only after a delay of at least 90 to 120 days. In addition sheet metal for skylights was under priority by reason of governmental restrictions. There is testimony that the new building could not be completed without the glass and skylights from the old one.

Plaintiffs commenced construction of the new store for occupancy by the Hills, but due to governmental restrictions defendants were unable to get materials for the contemplated chain store and parking lot. Because of this delay defendants on August 2, 1946, notified plaintiffs that construction of the chain store building was not contemplated in the immediate future, that until further written notice plaintiffs were not to proceed with the demolition, and that notice would be given in ample time for plaintiffs to have the improvements "dismantled and removed." Plaintiffs answered by letter that they intended to proceed since the plate glass and skylights in the old building were needed for use in the construction of the new store. On September 10 defendants wrote to plaintiffs that they were not to dismantle the improvements on Lots 15 and 16 nor to enter the premises except as customers of the Hills until such time as written permission was given by defendants, and that "for any known violations of these instructions redress at law will be had."

On September 27 defendants instituted a proceeding in which they sought a declaration of their rights to the building as owners of the premises and further requested that a pre-

liminary injunction issue to restrain plaintiffs from dismantling the old building on Lots 15 and 16. At the hearing on the application for the injunction it appeared that the new building for the Hills had then been completed except for the glass and the skylights. On October 18 the trial court denied the preliminary injunction and a few days later sustained a demurrer to the complaint with leave to amend.

Toward the end of October plaintiffs removed the plate glass and skylights from the old building and completed the new building for the Hills. About October 30 the Hills abandoned the old building, and plaintiffs thereupon entered defendants' premises and demolished and removed the building. On November 1 the Hills moved to the new store constructed for them by plaintiffs. In December the court sustained, with leave to amend, a demurrer to an amended complaint for declaratory relief, and no further action was taken in that proceeding.

Defendants refused to pay either the agreed price of $3,500 due upon demolition of the old building or the unpaid balance of $2,500 due to the Hills for surrender of the lease. The Hills assigned their claim to plaintiffs, who brought the present action to recover both amounts.

The trial court found and concluded that defendants had agreed to pay $3,500 upon removal of the building and the salvage, that the agreement had not been renounced by defendants, that they were estopped from changing their position or maintaining an action against the cross-defendants or repudiating the contract, that plaintiffs had the legal right to demolish the building and to take the salvage, and that they had fully performed the agreement on their part. The court also concluded that the sum promised by defendants to the Hills became due and payable when the Hills moved into the new building constructed for them by plaintiffs. Judgment was entered for plaintiffs in the sum of $6,000, which was the total amount sought in the complaint.

It should be stated at the outset that the order denying the preliminary injunction in connection with the proceeding for declaratory relief is not res judicata as to the issues herein presented. There is no inflexible rule as to the effect of the granting or denial of a preliminary injunction on subsequent litigation, but unless it appears that the court intended a final adjudication of the issue involved, a decision on an application for a preliminary injunction does not amount to a decision on the ultimate rights in controversy.

(See *Miller & Lux* v. *Madera Canal etc. Co.,* 155 Cal. 59, 62 [99 P. 502, 22 L.R.A.N.S. 391] ; 14 Cal.Jur. 184 ; 28 Am.Jur. 493.)

Here the court's action in sustaining the demurrer to the complaint with leave to amend indicates that its order denying the preliminary injunction was not intended as a final disposition of the rights of the parties.

The deposit receipt did not fix a definite date for demolition of the old building or specify how the salvaged materials were to be disposed of but provided only that the building was to be ''removed not later than twenty days prior to the completion'' of the chain store building, subject to payment of $70 per day in the event of failure to perform on time. It is undisputed, however, that the building was to be left standing for occupancy by the Hills until a new building was constructed elsewhere for them. Further, there is testimony that defendants stated during the negotiations that they did not want any part of the old building and that plaintiffs were to get it off just as soon as possible, and plaintiffs told defendants that they were going to use whatever material they could from the old building in constructing the new one for the Hills. From this evidence the trial court could reasonably infer that the parties had agreed that plaintiffs were to wreck the old building as soon as practicable after construction of the new store for the Hills and that plaintiffs should be entitled to the salvaged material after it had been removed.

Under the contract as thus construed, there was an implied covenant that plaintiffs would be given possession of the premises for the agreed purpose at a reasonable time to be chosen by them. (*Gray* v. *Bekins,* 186 Cal. 389, 395 [199 P. 797].) Defendants' conduct in forbidding plaintiffs to enter, therefore, was sufficient not only to excuse their performance but also to constitute a breach or anticipatory breach of the contract. (Civ. Code § 1511; *Crawford* v. *Pioneer Box & Lumber Co.,* 105 Cal.App. 760 [288 P. 694]; *Woodruff* v. *Adams,* 134 Cal.App. 490 [25 P.2d 529]; see 5 Williston on Contracts [Rev.ed. 1937], § 1293A, p. 3686.) The principal question for our determination, however, is whether plaintiffs could ignore the express notification from defendants not to enter the land and could proceed to demolish the building.

It is the general rule in California and in practically all other jurisdictions that either party to an executory contract has the power to stop performance of the contract by giving notice or direction to that effect, subjecting himself to

liability for damages, and upon receipt of such notice the other party cannot continue to perform and recover damages based on full performance. (*Richardson* v. *Davis,* 116 Cal.App. 388 [2 P.2d 860]; *Atkinson* v. *District Bond Co.,* 5 Cal.App.2d 738, 745 [43 P.2d 867]; see *Crawford* v. *Pioneer Box & Lumber Co.,* 105 Cal.App. 760, 765 et seq. [288 P. 694]; 5 Williston on Contracts [Rev.ed. 1937], § 1298, pp. 3693-3695; 12 Am.Jur. 979-980.) This is an application of the principle that a plaintiff must mitigate damages so far as he can without loss to himself. (See 5 Williston on Contracts [Rev.ed. 1937], § 1298, p. 3694.)

The reason for this rule is twofold: Ordinarily a plaintiff is interested only in the profit he will make from his contract, and if he receives this he obtains the full benefit of his bargain; on the other hand, performance by the plaintiff might be useless to the defendant, although he would have to pay the entire contract price if the plaintiff were permitted to perform, and this would inflict damage on the defendant without benefit to the plaintiff. (See 5 Williston on Contracts [Rev.ed 1937], § 1298, p. 3694; *Dowling* v. *Whites Lumber & Supply Co.,* 170 Miss. 267 [154 So. 703, 705].) If these reasons are not present, the rule is not applied. For example, where the plaintiff is not interested solely in profit from the agreement but must proceed with the work in order to fulfill contract obligations to others, or where refraining from performance might involve closing a factory, damages may be inadequate and the plaintiff may have a right to continue performance. (*Southern Cotton-Oil Co.* v. *Heflin,* 99 F. 339 [39 C.C.A. 546]; 5 Williston on Contracts [Rev.ed 1937], § 1299, p. 3696.) It has likewise been held that where a contractor has started work and has reached a point where it would be impracticable to attempt to make a reasonable estimate of damages, or where to complete the work will diminish damages or at least not enhance them, the contractor may go forward and complete performance. (*Dowling* v. *Whites Lumber & Supply Co.,* 170 Miss. 267 [154 So. 703].) In the Restatement of Contracts, comment a on section 336, it is said that "It is not reasonable to expect the plaintiff to avoid harm if at the time for action it appears that the attempt may cause other serious harm. He need not enter into other risky contracts, incur unreasonable inconvenience or expense, disorganize his business, or put himself in a humiliating position or in one involving loss of honor and respect."

The general rule is also subject to the jurisdiction of equity

to order specific performance of the contract, and, apparently in recognition of this principle, it has been held that in cases where damages will not afford adequate compensation and where specific performance will lie, the plaintiff may continue to perform, in spite of a notice to stop, and thereafter recover on the basis of his continued performance. (*Marsh* v. *Blackman,* (N. Y. Supreme Court), 50 Barb. 329; *Fine Art Pictures Corp.* v. *Karzin,* (Mo.App.) 29 S.W.2d 170, 173; see *Woodman* v. *Blue Grass Land Co.,* 125 Wis. 489, 494 [103 N.W. 236, 237, 104 N.W. 920]; *Badger State Lumber Co.* v. *G. W. Jones Lumber Co.,* 140 Wis. 73 [121 N.W. 933, 934]; 17 C.J.S. 979; 12 Am.Jur. 980; cf. *La Salle Extension University* v. *Ogburn,* 174 N.C. 427 [93 S.E. 986, 988, Ann.Cas. 1918C 887].) In the Fine Art Pictures decision the court stated that this is one of the necessary exceptions to the rule. (29 S.W.2d at p. 173.)

In the present case the trial court granted relief similar to that which has been allowed under this exception to the general rule. The court determined that plaintiffs acted properly in performing the contract on their part and that, having performed, they were entitled to the full amount of $6,000 due under the agreement. In the light of the foregoing, we must consider whether the facts bring this case within the reasons underlying the general rule or the reasons for the exception, and we must determine whether there is sufficient evidence to show that plaintiffs would have been entitled to specific performance and that damages would have been inadequate.

Unlike the situations presented in *Richardson* v. *Davis,* 116 Cal.App. 388 [P.2d 860], and *Crawford* v. *Pioneer Box & Lumber Co.,* 105 Cal.App. 760 [288 P. 694], relied upon by defendants, the agreement involved here did not provide simply for the payment of money in return for the performance of services. As we have seen, it was contemplated that plaintiffs were to keep all salvaged material. During the negotiations for the agreement they informed defendants that they planned to use as much of this material as they could in constructing the new building for the Hills, and, in reliance on the contract, they altered the plans for the new building to permit use of the glass and skylights from the old one. These materials were then scarce, and sheet metal for the skylights was under priority. There was testimony that it would take from 90 to 120 days to obtain new glass and sky-

lights, and some other glass required for the new building did not arrive until about five months after it was ordered. Except for the glass and skylights the new building was completed sometime in October, and the lack of these materials left it exposed to the weather and apparently unsuitable for occupation by the Hills. Thus it is obvious that an essential element of the rule giving one party the power to stop performance by giving notice not to perform is lacking here since plaintiffs were not interested solely in the profit to be derived from tearing down the old building and selling the salvage, but they had an additional interest in obtaining actual performance of the agreement so that they could secure scarce materials and complete the new building.

The fact that the agreement involved property which was scarce and under priority is of particular importance in the present case. There are analogous decisions in other jurisdictions holding that a purchaser does not have an adequate remedy at law and may obtain specific performance of a contract to sell materials if he needs them in his business and cannot obtain them or their equivalent within the local marketing area. (*Oreland Equipment Co.* v. *Copco Steel & Engineering Corp.*, 310 Mich. 6 [16 N.W.2d 646]; *Eastern Rolling Mill Co.* v. *Michlovitz*, 157 Md. 51 [145 A. 378, 383-384] [steel scrap, not procurable in the area]; *Conemaugh Gas Co.* v. *Jackson Farm Gas Co.*, 186 Pa. 443 [40 A. 1000, 1001, 65 Am.St.Rep. 865], *Gloucester Isinglass & Glue Co.* v. *Russia Cement Co.*, 154 Mass. 92 [27 N.E. 1005, 1007, 26 Am.St.Rep. 214, 12 L.R.A. 563]; see *Campbell Soup Co.* v. *Wentz*, 172 F.2d 80, 82-83; 152 A.L.R. 4, 26-29.) Some of these cases were decided in states which, like California, have adopted the Uniform Sales Act provision authorizing specific performance, in the discretion of the court, of contracts to sell goods. (See, e.g., Civ. Code § 1788.) Although the Uniform Sales Act may not be directly applicable here, since part of the consideration was the transfer of realty (Civ. Code, § 1729, subd. 3), the cases are nevertheless in point insofar as they hold that damages do not afford an adequate remedy in such a situation. Moreover, the adoption of the Uniform Sales Act exemplifies a tendency to liberalize the requirements for specific performance of contracts to sell or transfer personal property. (See 3 Williston on Sales [Rev.ed. 1948], § 601; *cf. Sanford* v. *Boston Edison Co.*, 316 Mass. 631 [56 N.E.2d 1, 3, 156 A.L.R. 644], stating that there is a "growing tendency"

to allow specific performance where damages are not the equivalent of the performance.)

Under these circumstances the trial court could properly conclude that inability to obtain the salvage from the old building would seriously interfere with completion of the new building, that equivalent materials could not then be secured by plaintiffs and that in an action for breach of contract damages would be difficult to ascertain and would be inadequate.

■ Defendants argue that plaintiffs were not entitled to proceed with performance because they could have covered up the holes in the new building with boards to protect it from the weather until new glass and skylights could be obtained and, further, that the glass and skylights from the old building, even if required, could have been removed without tearing down the entire structure. Boarding up the new building, however, would have rendered it unusable for an indefinite period. Also, removal of part of the old building without demolition of the remainder was not authorized by the agreement, and there is nothing in the record to indicate that defendants had suggested or would have consented to such a step, even though they knew that the need for the glass and skylights was the principal reason for plaintiffs' insistence upon full performance of the contract. All of these factors were, of course, to be considered by the trial court in passing upon the propriety of plaintiffs' conduct, and we cannot say as a matter of law that plaintiffs were required to adopt one of the solutions now mentioned by defendants.

■ Defendants introduced testimony that the value of the old building, if allowed to remain on the property for continued use, was $26,250, and they contend that demolition of such a valuable structure was not justified by plaintiffs' need for the salvage, which, it is asserted, could have been replaced for $540. Regardless of the weight to be given this testimony, however, the trial court could properly consider the facts that defendants had purchased the property for construction of a chain grocery store, that they had made a lease to the chain store operators by which they agreed to deliver possession of Lots 15 and 16 for use as a parking lot with all improvements removed, and that for this reason the building had little if any value for continued use on the property. On the other hand the value of the salvage to

plaintiffs was enhanced by their need of materials for the new building.

The next question is whether plaintiffs' right to complete performance of the agreement could be defeated by the fact that plaintiffs were required to enter defendants' realty in order to remove the building and had been notified not to enter or to dismantle the improvements. Defendants contend that the entry and removal of the building contrary to the notice constituted trespass and malicious destruction of property, entitling them to damages under their cross-complaint. As we have seen, the agreement gave plaintiffs an implied contractual right or license to enter defendants' realty for the purpose of removing the building, and the problem is whether, under all the circumstances, the license was irrevocable or whether defendants had a power to revoke it.

■ A mere license to enter or use premises may be revoked at any time by the licensor. (See *County of Alameda* v. *Ross*, 32 Cal.App.2d 135, 143 [89 P.2d 460]; 16 Cal.Jur. 285; 33 Am.Jur. 404.) Various factors, however, may render a license irrevocable, and it is generally recognized that a license coupled with an interest is not revocable but continues to exist for the period contemplated by the license. One example of a license coupled with an interest is the right of an owner of personal property to remove it when it has been placed with permission upon the land of another. (See 3 Tiffany, Real Property [3d ed. 1939], § 835; 53 C.J.S. 819.) Similarly, where there has been a sale of personal property located on the land of the vendor, the purchaser has an irrevocable license to enter and remove the property within a reasonable time. (See *Rogers* v. *Cox*, 96 Ind. 157 [49 Am.Rep. 152] [sale of a frame building]; *Holt* v. *City of Montgomery*, 212 Ala. 235 [102 So. 49, 51]; *Sterling* v. *Warden*, 51 N.H. 217, 227 [12 Am.Rep. 80]; Rest., Torts, § 181; 3 Tiffany, Real Property [3d ed. 1939], § 835; 53 C.J.S. 819.)

Under these authorities it is clear that plaintiffs would have had an irrevocable license to remove the building within the period contemplated by the agreement if title to the building had passed to them before defendants had given notice not to enter. Although the agreement apparently contemplated that title to the salvage would not pass until the building was severed from the land, the situation is closely analogous to one in which title had been transferred, because, as we have seen, plaintiffs had a right to specific performance of the agreement and thereby to acquire legal title, and unlike the

ordinary case of an executory contract to sell chattels located on the property of the vendor, defendants could not prevent completion of the contract by repudiating it and subjecting themselves to damages. (See *Holt* v. *City of Montgomery*, 212 Ala. 235 [102 So. 49, 51], where the court stated that the license was irrevocable, although title apparently had not passed.) The same reasoning which justifies the conclusion that defendants could not repudiate the contract because plaintiffs had a right to specific performance supports the conclusion that they could not revoke the implied license to enter, exercise of which was essential to plaintiffs' completion of the agreement. It follows that plaintiffs' license to enter defendants' realty was coupled with an interest and was irrevocable, giving them a reasonable time to remove the old building.

There is also authority that a revocable license may become irrevocable on the basis of estoppel where the licensee has performed work or expended money in reliance thereon. (*Miller & Lux* v. *Kern County etc. Co.*, 154 Cal. 785 [99 P. 179]; *Stoner* v. *Zucker*, 148 Cal. 516 [83 P. 808, 113 Am.St. Rep. 301, 7 Ann.Cas. 704]; see 2 Thompson on Real Property [Perm.ed.], § 720; 33 Am.Jur. 408.) In the present case plaintiffs, in reliance upon the agreement, changed the plans for the new building and constructed it in such a manner as to permit use of the glass and skylights from the old building, and the trial court found that defendants were estopped from repudiating the agreement. However, since plaintiffs had an irrevocable license, it is unnecessary to consider the contentions of the parties relating to estoppel.

In view of the foregoing we conclude that the facts found by the trial court, supported by the evidence, are sufficient to justify the determination that plaintiffs acted within their rights in fully performing the agreement, that they did not commit trespass, and that they were not liable for damages for destruction of the old building. Defendants, on the other hand, became liable to pay plaintiffs the sum due under the contract upon completion of the demolition.

Defendants contend that the Hills abandoned the premises and failed to surrender them in good condition to defendants as required by the lease, that the Hills were guilty of permissive waste in allowing plaintiffs to demolish the building, and that for these reasons the Hills are liable for the value of the building. As a defense to plaintiffs' claims as assignees of the Hills, defendants contend that the asserted

abandonment and waste resulted in a forfeiture of the right to recover the money which defendants promised to pay the Hills in return for voluntary relinquishment of the lease.

There is no merit to these contentions. It is undisputed that the Hills agreed to surrender their lease upon payment of $4,000 by defendants, less $300 per month after March 1, 1946, and to vacate the old building immediately upon completion of the new one by plaintiffs. Defendants promised to pay this amount when the lease was surrendered. The Hills placed the lease in escrow with instructions to deliver it to defendants upon receipt of the agreed amount, and they vacated the old building as soon as the new one was ready. They did not surrender the building to defendants but "just moved out," and they did not lock the door because plaintiffs had previously removed the glass and "there was no door to lock." There is nothing in the record which would compel the trial court to find that there was anything wrongful in the acts of the Hills or that plaintiffs would not have removed the building even if the Hills had gone through the formality of surrendering it to defendants. As we have seen, plaintiffs had an irrevocable license to enter and a right to tear down the building, enforceable by specific performance, and it cannot be said that the Hills are guilty of waste because of plaintiffs' rightful actions in demolishing the building or that the absence of a formal surrender to defendants operated as a forfeiture of the right to recover the agreed payment. Accordingly, the trial court correctly determined that the Hills were not liable to defendants and that the sum promised by defendants became due when the Hills vacated the premises.

The judgment is affirmed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J. concurred.

Appellants' petition for a rehearing was denied August 24, 1950.